No. 3966

Second Circuit

DURRETT v. EICHER-WOODLAND LBR. CO., INC., ET AL.

(July 14, 1931. Opinion and Decree.)
(October 1, 1931. Rehearing Granted.)

Sidney I. Foster, of Leesville, attorney for plaintiff, appellant.

Pujo, Bell & Hardin, of Lake Charles, and White, Holloman & White, of Alexandria, attorneys for defendants, appellees.

McGREGOR, J. The defendant, Eicher-Woodland Lumber Company, Incorporated, is a commercial corporation organized under the laws of the state of Louisiana with its principal place of business and legal domicile at Alexandria in the parish of Rapides, in this state. It is engaged generally in the sawmill and lumber business. The defendants, B. J. and J. R. Sharp,

residents of the state of Louisiana, with their domicile at Laurel Hill, in the parish of West Feliciana, were under contract with Eicher-Woodland Lumber Company, Incorporated, in the latter part of 1928 and the first of 1929 to cut and deliver certain logs in Louisiana and Mississippi in the form of lumber. In carrying out this contract the Sharps employed from twenty-five to thirty men at Laurel Hill, Louisiana, and on about January 1, 1929, they took these same men over the line into the state of Mississippi near the town of Woodville to convert a tract of timber belonging to Eicher-Woodland Lumber Company into lumber. Among these employees of the Sharps was Monroe Durrett, a son of the plaintiff, who worked for the Sharps in both states. It appears that the employment, as well as the nature of the work, was the same in both states and that the relation of the Sharps to the Eicher-Woodland Lumber Company was that of independent contractor.

On or about December 26, 1928, B. J. Sharp stopped at the home of the plaintiff, D. W. Durrett, in this state and during the conversation had it was agreed that if the plaintiff would come where the Sharps were working he would be given employment of some kind. Plaintiff's son, Monroe Durrett, was given employment on that same occasion and went at once to Laurel Hill, Louisiana, and began work on December 29, 1928. The plaintiff, D. W. Durrett, accompanied his son to Laurel Hill on this occasion and again saw B. J. Sharp, who asked him when he would be ready to come over and begin working for him. The answer was that he would come about January 14th. This conversation was heard by plaintiff's son, Monroe Durrett, and by M. T. Barnidge. A few days afterwards, early in January, Monroe Durrett moved over into Mississippi with the rest of the Sharps' crew and continued his employment there, and B. J. Sharp communicated with the plaintiff, D. W. Durrett, either by mail or wire and told him to come on over to Mississippi and go to work. D. W. Durrett answered by mail or wire, saying that he needed money to make the trip, so that Sharp immediately sent him $10 by wire to a bank. This was not received by the plaintiff. On or about January 14, 1929, Monroe Durrett was called back to Louisiana on account of the death of his wife's mother. B. J. Sharp on this occasion told Monroe Durrett to tell his father, plaintiff herein, to come immediately and begin work according to his agreement. This was after the $10 had been sent for plaintiff's expenses but which was not received by him. On the night of January 17, 1929, plaintiff arrived in Mississippi with his son at the Sharps' place of operations and went to work the next morning as sawyer in the sawmill. He worked only a few days, for on January 21, 1929, he was injured in his right hand by falling on the saw which he was operating. He could work no more and as soon as he was able he returned to his home in Louisiana.

While the Sharps were operating in Louisiana for Eicher-Woodland Lumber Company this company carried employers' liability insurance on all men working for them, including those that were working for the Sharps. There is no evidence to show that the Sharps made a new contract with their men or with Eicher-Woodland Lumber Company, Incorporated, when they went over into Mississippi to continue their operations, but the employers' liability insurance was canceled. Eicher-Woodland Lumber Company qualified to do business in Mississippi under the laws of that state and took out two blanket policies of insur-

ance—one against liability and the other known as workmen's collective insurance for not more than twenty-six weeks. On May 31, 1929, T. H. Mastin and Company, who wrote both policies, paid to plaintiff $332.70 as a payment due under what is termed the collective insurance and $200 as compromise settlement of any claims that plaintiff might have on account of negligence. These two amounts were accepted and in the written receipts it is declared that the amounts named were in full payment for all claims that the plaintiff might have on account of the injury he had received to his hand. Notwithstanding this attempted settlement, plaintiff evidently decided that he had not received all that he was entitled to, for on May 12, 1930, he filed this suit under the Employers' Liability Act of Louisiana, for 65 per cent of $30 per week for a period of 150 weeks for the total loss of the use of his right hand, plus 50 per cent as a penalty for making a lump sum settlement without authority of the court, less a credit of what had been paid him by the defendants. In addition to this demand he also asked judgment for a reasonable sum to cover the necessary hospital expenses.

All the defendants answered and the defense made is that the injury occurred in Mississippi, that the contract of employment under which the plaintiff was working when he was injured was made in that state and under its laws, that all liability on account of plaintiff's injury is governed by these laws, and that, therefore, the receipts signed by the plaintiff estopped him from making any demand for compensation under the Employers' Liability Act of Louisiana (Act No. 20 of 1914, as amended). Upon trial there was judgment in the lower court for the defendants, reject-

ing the plaintiff's demands and from that judgment he has appealed.

Since the filing of this suit and trial, in the lower court, and since the appeal was lodged in this court, the defendant Eicher-Woodland Lumber Company, Incorporated, has been placed in the hands of a receiver by an order of the Ninth Judicial District Court, in and for the parish of Rapides, and John T. Powers, a resident of Rapides parish, has been appointed receiver. Upon proper application to this court the said John T. Powers, in his capacity as receiver, has been made party defendant in this suit and the plaintiff has been authorized to prosecute the appeal against the said receiver.

## OPINION

It is admitted by all the defendants that if plaintiff had received his injury in the state of Louisiana, the Employers' Liability Act of this state would apply and the plaintiff would have a right of action against Eicher-Woodland Lumber Company, Inc., and also against the Sharps. The question, therefore, that must be determined is as to whether the plaintiff has a right of action under this law when the work was performed over across the line in the state of Mississippi. It is contended by the defendants that plaintiff's contract was made in the state of Mississippi, and this fact is urged as one of the reasons why the laws of that state should govern all rights arising on account of the injury received. With reference to the place where the contract of employment was entered into, the following facts are established by the evidence:

B. J. Sharp was at the plaintiff's home in Louisiana on December 26, 1928, and employed one of plaintiff's sons, Monroe

Durrett, to begin work at once at Laurel Hill, Louisiana, and at the same time it was agreed that the plaintiff would begin work as soon as possible. This son arrived in Laurel Hill, Louisiana, on December 29th and began work pursuant to the contract made on the 26th at plaintiff's residence. If plaintiff had been ready he would have started work at the same time and place, for, as just stated above, on December 26th at his home in Louisiana it was agreed between the plaintiff and the same B. J. Sharp that he, the plaintiff, would come either to Laurel Hill, Louisiana, or to Woodville, Mississippi, to begin work for the Sharps. B. J. Sharp at that time learned that plaintiff was a competent sawyer and he was subsequently assigned to that work by the said Sharp because of the information received at this time as to his qualifications. In the early part of January, Sharp wrote a letter to plaintiff urging him to come at once. To this letter plaintiff replied that he needed expense money in order to make the trip to Mississippi. This money was sent but plaintiff never received it, and as a consequence his going was delayed, and on January 14th Sharp sent word to the plaintiff by Monroe Durrett to hasten his coming as work was ready for him. On this date plaintiff's son came to Louisiana to attend the funeral of his wife's mother. Plaintiff took advantage of his son's presence in Louisiana in his automobile to return with him to Mississippi and on January 17th he arrived at Sharp's mill with his son and began work on the next morning as sawyer. Nothing was ever agreed on as to wages until after the accident. This summary of the testimony convinces us that the actual agreement between the parties took place at the home of the plaintiff in Louisiana. Every communication after that, whether by wire, mail or personal messenger, had reference to the carrying out of the agreement made in Louisiana at plaintiff's residence, on December 26, 1928. From that time the Sharps were depending on the plaintiff, while plaintiff was making all his preparations to go in accordance with the agreement. So that, under the evidence there can be no doubt as to the contract of employment having been consummated in Louisiana. But the defendants contend that even though it be held that the contract itself was made in Louisiana, it was made by the Sharps as independent contractors for service to be rendered in the state of Mississippi to Eicher-Woodland Lumber Company, Incorporated, who had qualified under the laws of that state to do business there, and that, therefore, all parties to the contract will be governed by the laws of Mississippi instead of by the Employers' Liability Act of Louisiana. It is admitted that there is no employers' liability law in the state of Mississippi and that under the law of that state the receipts signed by the plaintiff for the money received by him are binding and that he has no right to demand any further amount in any kind of suit in that state under its laws. It is admitted further that no sanction of any court was sought or had in making the compromise settlement that was made and that if the Employers' Liability Act of Louisiana is applicable in this case, the plaintiff has a right to prosecute this suit in spite of the settlement and signed receipts.

In determining whether the Employers' Liability Act of Louisiana or the laws of the state of Mississippi shall prevail in this case, our finding that the contract was actually consummated in Louisiana and the fact that all the parties concerned are residents of and domiciled in Louisiana must be considered. Whatever profit might be made in the performance of the contract

went directly to enrich and benefit the citizens of Louisiana and a corporation chartered under the laws of Louisiana with its domicile in the state. Eicher-Woodland Lumber Company, Incorporated, employed the Sharps as independent contractors to convert its timber in Louisiana and Mississippi into lumber. In whichever state the work was performed under the contract the obligation toward the Sharps was the same. An independent contractor is not entitled to compensation, but whatever rights he may have under his contract made in this state he carries with him wherever he goes. One of those rights is that his men shall receive compensation under the Employers' Liability Act from his employer. Suppose a tract of timber belongs to Eicher-Woodland Lumber Company, Incorporated, located in both states and the mill site were in both states, and that on account of this fact the state of Mississippi required Eicher-Woodland Lumber Company, Inc., to qualify under its laws to operate and do business in that state. Would that fact deprive the workmen of the benefits of compensation in cases where the injuries occurred over the line in Mississippi? We think not. The employment of Louisiana citizens in Louisiana by other Louisiana citizens to work in Mississippi does not deprive the employee of any of the stipulations of the contract of employment. Every contract contains certain agreements and stipulations and these are binding without regard to the place where the work is performed. Under our law in every contract of employment made with reference to a hazardous occupation, it is presumed that all the parties thereto have elected to be subject to all the provisions of the Employers' Liability Act unless it is expressly stipulated to the contrary in the manner provided by law. So that all acts under this law are ex contractu and not ex delicto. When Eicher-Woodland Lumber Company, Inc., contracted with the Sharps to convert its timber into lumber there was presumed to be written into the contract that the said Eicher-Woodland Lumber Company, Inc., would pay compensation to all the employees of the Sharps under the terms of the Employers' Liability Act of Louisiana. But defendants contend that this does not apply when the work is to be performed in another state. When the parties entered into this contract the presumed or implied provision for compensation was just as much a part of the contract as was the price for cutting the timber or any other express stipulation. The parties have no more right to eliminate this implied provision that the law writes into every contract for the benefit of the employees than they have to eliminate any of the other or express provisions. This question of the extraterritorial operations of the Employers' Liability Act of Louisiana does not appear to have been passed on by the Supreme Court of this state and only once has it been presented to any of the Courts of Appeal. The case of Hargis v. McWilliams Co., 9 La. App. 108, 119 So. 88, 89, is relied on by the plaintiff, but counsel for defendants insist that this case is not applicable for the reason that it was expressly stipulated in advance that the Employers' Liability Act would apply even though the work contracted to be done was in another state. But this case was decided as though that special provision was not in the contract. The Employers' Liability Act was passed in order to take the place of the right of action that an industrial worker in any hazardous occupation would have under article 2315 of the Revised Civil Code of Louisiana, provided the parties to the contract so elect, and the act specially provides that they are presumed to have elected to come under its

provisions unless it is specially stipulated to the contrary. (Sec. 3, pars. 1 and 2 of the Employers' Liability Act, as amended by Act No. 28 of 1918 and Act No. 85 of 1926.) The court in the case cited holds that, since the law presumes that the provisions of the act are accepted by the parties, this presumed election to be subject to and to be bound by the provisions of the act, applies to the full performance of the contract whether it is in the state or out of it. If, under the terms of the contract, its duration is to be six months this provision would not be affected by the fact that some or all of the terms of service are to be out of the state. The same thing will apply to any other detail of the contract. Crossing a state line would have no effect on them. So a stipulation to receive compensation under the Employers' Liability Act in lieu of any other method, form or amount of compensation provided by law is as binding outside of the state as it is within. But it might be said that there is no provision in the act to the effect. In meeting this same argument, the court in the Hargis v. McWilliams case said:

"The principal argument in some of these cases, is that 'there is no provision of the Act (compensation) which can be construed to authorize compensation for an injury occurring outside of the state.' The answer to that is that there is no provision in the law restricting the liability to accidents within the state, nor any general law to that effect. It is true that article 10 of our Code provides that the effect of acts passed in one country to have effect in another country is regulated by the laws of the country where such acts are to have effect.

"But this article does not pretend to affect the rights acquired by parties under a contract made in another country. If the Employers' Liability Act of Louisiana protects an employee against an injury suffered in another state, then this article 10 has no application.

"The object of the Compensation Act is to protect a contract made in Louisiana.

"It is immaterial under the act where the work has to be done; the law looks to the workman, not to the place where the work is done. The workman is not deprived of the protection of the law because the work is done outside of Louisiana. * * *

"Nothing in this act restricts liability for work within the state. It suffices that the contract of employment be made in Louisiana to carry with it the liability of the employer fixed by that statute.

"It matters not where the work is to be performed; the question is where was the contract made. If the law of the place where the contract was made fixes liability, the liability follows the employer wherever the work is done. Any other view would leave the workman without remedy or relief contrary to the object and spirit of the law and against the principle that the compensation law must be interpreted liberally, in a sense favorable to the workman.

"The Employers' Liability Act of Louisiana forms part of every contract made in Louisiana for the employment of labor and carries with it the liability of the employer under said act for every injury suffered by the employee in the course of his employment in executing the work within or without the state."

This same question has been presented many times to the courts of other states and has been decided different ways with various and sundry reasons assigned by the courts. Owing to the wide divergence of views found in the many cases on the subject, it would not be profitable to undertake any summary of them. To get a better idea of the underlying reasons supporting the theory that an express provision in a contract or one implied by law stipulating that the parties will be bound by the Employers' Liability Act in matters of compensation for injuries to employees has extraterritorial effect in its operations we need but to get a clear conception of the fundamental reason underlying all such laws. All employers' liability acts are a

matter of evolution. They have come into existence to relieve an economic situation. The principal idea involved in them all is that each industry must bear all the necessary expenses connected with it. And it has been found that the expense of being injured is just as much a part of the legitimate cost of the products of the industry as any other item of expense. So it has been decided by law for the industry as such to bear this expense. In discussing this identical point the Supreme Court of Minnesota in the case of State ex rel. Chambers vs. District Court, 139 Minn. 205, 166 N. W. 185, 187, 3 A. L. R. 1347, said:

"A basic thought underlying the compensation act is that the business or industry shall in the first instance pay for accidental injuries as a business expense or a part of the cost of production. It may absorb it or it may put it partly or wholly on the consumer if it can. The economic tendency is to push it along just as it is to shift the burden of unrestrained personal injury litigation. When a business is localized in a state there is nothing inconsistent with the principle of the compensation act in requiring the employer to compensate for injuries in a service incident to its conduct sustained beyond the borders of the state. The question of policy is with the legislature. It may enact an elective compensation act bringing such result if it chooses. In the case before us the business of the employer was localized in the state. What the employee did, if done in Minnesota, was a contribution to the business involving an expense and presumably resulting in a profit. It was not different because done across the border in North Dakota. It was referable to the business centralized in Minnesota. Sometimes the construction which we adopt will result to the immediate advantage of the employee and against the employer and sometimes the result will be the reverse. Whatever view is adopted perplexing situations may arise. Business has scant respect for state boundaries. An industry may be located a part in one state and a part in another, or it may have separate business situs in two or more, and its employees may from time to time work in each and may reside in one or another at their convenience."

This question is also ably discussed in the case of Kennerson v. Thames Towboat Company, 89 Conn. 367, 94 A. 372, 376, L. R. A. 1916A, 436. In that case the Connecticut Supreme Court said:

"The remedy provided by our Compensation Act is substitutionary in character, furnishing what was purposed to be a more humanitarian and economical system as a substitute for one deemed wasteful to industrial enterprises and commerce, and unfair to employees. Its intent was to afford its protection to all Connecticut employers and employees who might voluntarily choose to make its provision for compensation for injury a part of their contracts of employment. It assumed that accident is incident to employment, and purposed to charge its cost in the case of every injury not caused by the willful and serious misconduct or intoxication of the injured employee to the industry in which it occurred. It intended that the employee should know what compensation he or his dependents would receive in the event of injury, and that payment should be made speedily by a procedure at once simple and inexpensive. It intended that the employer should know his liability in this regard, and so might include it among the items charged to operation. If our act intends its contracts of employment to include compensation for injuries occurring only within our jurisdiction, it manifestly defeats its own ends. In that case the employer may not charge to the industry the compensation for injuries occurring without the state, and the employee or his dependents may not collect the same. Neither employer nor employee can know what portion of this period of employment will be subject to the provisions of the act, and no provision for insurance of this liability will be practically possible, since it may not ordinarily be known what part of the service will be in and what part out of the state, or in what jurisdiction the service will be performed, in industries and commercial enterprises engaged in intra-

state and interstate employment. The state boundary is not the limit of very many businesses. To subject them to the laws of the many jurisdictions in whch they may be engaged will be especially burdensome to them, and involve them probably in greater expense and liability and far greater difficulties than under the old system. Equally hard will it prove to the employee since he must pursue his remedy in the state of the accident, or the federal court applying that state's law, and thus he may be brought under any one of many different compensation acts, with whose provisions he cannot hope to be familiar, some acts contractual in character, some compulsory, some optional, and some ex delicto, and he may find he has forfeited the benefit of the foreign act through failure to comply with its provisions. A reading of the several acts now in force convinces us that these difficulties are not imaginative, but imminent actualities.

"Is it reasonable to infer that our Legislature, inaugurating a new system, based upon humanitarian and economical considerations, should intentionally frustrate the object of the new system, and cast a multitude of employers and employees into a maelstrom of trouble, uncertainty, and liability? On the other hand, is it not reasonable to infer that the Legislature, having bottomed the right to compensation upon contract, deemed unimportant the place of injury, since it must be presumed to have known that it, and not the place of injury, would govern the recovery? Such a construction of the act would lift insuperable burdens from industry and commerce and workmen, and give to each his course and the ascertained fruits of the contract of his will."

In the case at bar the business of the defendant, Eicher-Woodland Lumber Company, Inc., was localized at Alexandria in Rapides parish of the state of Louisiana. All the business operations in Mississippi were referable to the business of the defendant centralized in Louisiana. Whatever was done in Mississippi was done for the benefit and profit of the Louisiana business under the terms and stipulations of a Louisiana contract made in Louisiana under its laws with an implied stipulation that the parties had elected to be bound by the provisions of the Employers' Liability Act. All the defendants and the plaintiff were residents of this state and would be enriched by the profits of the Mississippi operations.

Counsel lay great stress on the fact that the defendant, Eicher-Woodland Lumber Company, Inc., had qualified to do business under the laws of Mississippi. But that act can not nullify or have any effect on the performance of a Louisiana contract in Mississippi. This defendant being a corporation, it was necessary for it to comply with the state regulations in Mississippi so that the state could reach and control it in all matters arising between it and citizens of that state. Otherwise it could not be sued in the state. If that defendant had been an individual, this requirement would not have been necessary, for his personal presence in the state would give jurisdiction over him in all matters growing out of his operations in which that state or its citizens might be interested. But in either case would the contractual rights of the parties be affected where the contracts were made in Louisiana between Louisiana citizens and residents? In their brief counsel for defendants say:

"It is thoroughly settled that when a foreign corporation complies with the provisions of law entitling it to admission to a State and to do business therein, it is entitled to the benefits and subject to the burdens imposed by that State to the same extent as though it were a domestic corporation. It, like an individual, takes the new domicile with all the laws controlling."

The answer to that argument is this: Parties to a contract have the right to renounce any particular provision of the law

made in their behalf. It is admitted that in the state of Mississippi, there is no Employers' Liability Law, but an employer and his employee could enter into a binding written contract embodying the Louisiana Employers' Liability Act as a whole, either expressly or by reference, and their agreement that all injuries should be compensated under the provisions of that law, and that this compensation should be in lieu of all other remedies provided by the laws of Mississippi, would be binding and enforceable. In Louisiana we have such a law. Every contract is presumed to embody all the provisions of this act unless otherwise stipulated. When a contract is thus entered into that provision is just as binding as any other, and crossing a state line does not change its binding effect. When plaintiff entered into this contract with the Sharps in Louisiana, the law wrote this provision into it, and it was binding wherever the work was carried on. The fact that at the time of the injury Eicher-Woodland Lumber Company, Inc., had no active operations going on in Louisiana is not important. It was still a Louisiana corporation. Its business was localized in Louisiana and it was subject to the laws of the state that brought it into existence and gave it whatever rights it had wherever those rights may have been exercised.

### EXTENT OF THE INJURY.

It is always a difficult matter to fix in terms of percentage the extent of the loss of the use or function of a member of a human body. In this case the plaintiff produced two reputable physicians who testified as to the condition of the plaintiff's hand. Falling against a saw in defendant's mill, the plaintiff's right hand was seriously cut and injured on January 21, 1929. On October 1, 1930, just before the date of the trial and nearly two years after the injury, Drs. M. W. Talbot and W. E. Reed, of Leesville, examined plaintiff's hand and agreed that it was in a hopeless condition, and that he had practically no use of it for industrial purposes. Because they were unwilling to say that plaintiff would be as well off with it amputated as he is with it in its present condition, when they were urged to fix a percentage of the impairment, they each fixed it at between 75 and 85 per cent. But the only use that they could suggest that plaintiff had of his hand was to pick up small objects. It is clear from all the testimony that for all intents and purposes plaintiff has lost the entire use of his hand and should be compensated on that basis.

Under the law the defendants should not have undertaken to make a lump sum settlement with the plaintiff without the approval and sanction of the court, as provided by law. The law has enacted a penalty for the violation of this provision, and under this provision the plaintiff would be entitled to and he is demanding an additional sum of 50 per cent of whatever the law would allow otherwise. But as this part of the statute is penal, it should not be enforced in cases where the defense was a reasonable one and in the making of which the defendants are justified. The question raised by the defendants in this case has not been well settled in this state. It has never been passed on by our Supreme Court, and the defendants were justified in raising it and endeavoring to establish their defense.

For the reasons assigned the judgment appealed from is annulled and set aside, and it is hereby ordered, adjudged, and decreed that there be judgment herein in favor of the plaintiff, D. W. Durrett, against the defendants, Eicher-Woodland Lumber

Company, Inc., John T. Powers, receiver, and B. J. and J. R. Sharp, in solido, for the lump sum of $19.50 per week for one hundred fifty weeks, or $2,925, less $601.70 already paid, with legal interest from May 31, 1929, and all the costs of both courts.

DREW, J., dissents for the reason that no contract was entered into in this state.

---

## ON REHEARING

CULPEPPER, J.   This case is on rehearing upon application of defendants, appellees.   Our former opinion rendered July 14th last, reversed the judgment of the lower court, which rejected plaintiff's demands, and rendered judgment for plaintiff.

Defendants, in their application for a rehearing, contend that the court erred in holding that the contract of employment alleged upon was entered into in Louisiana. It is contended that the testimony as to the conversation had between plaintiff and B. J. Sharp, one of the defendants, at the former's home at Cheneyville, Louisiana, did not constitute a contract as was held by this court; that neither did the interchange of letters or telegrams between Sharp and the plaintiff while plaintiff was at Pitkin, Louisiana, and while Sharp was at Woodville in Mississippi, amount to a contract.

Defendants further contend that even though the contract was entered into in Louisiana, the laws of Mississippi, and not those of Louisiana, should apply to this case, for the reason that Eicher-Woodland Lumber Co., Inc., had fixed its domicile in Mississippi and had appointed a state agent in that state, thereby accepting the benefits and burdens of that state, hence the court erred in holding that the laws of that state did not apply; that the court

erred in considering the fact that all parties concerned were residents of and domiciled in Louisiana; that such is not necessary or even incident to a decision of the facts; that the court erred in holding that Eicher-Woodland Lumber Co., Inc., had a blanket contract with the Sharps to convert its timber in Louisiana and Mississippi into lumber, when in truth and in fact when this contract was made for work in Mississippi with the Sharps, the Eicher-Woodland Lumber Co., Inc., had no timber in Louisiana; that the court erred in holding that this contract, if any had, was to be performed on either side of the state line, in fact it was only to be performed in Mississippi.

For brevity the court will hereafter refer to Eicher-Woodland Lumber Co., Inc., as Eicher-Woodland, and to B. J. Sharp and J. R. Sharp as the Sharps.

As to the question of whether the contract alleged upon was entered into in Louisiana, the testimony shows substantially as follows: On December 26, 1928, B. J. Sharp, a member of the partnership of B. J. Sharp and J. R. Sharp, came to the home of plaintiff near Cheneyville in Louisiana to hire Monroe Durrett, plaintiff's son, as a truck driver for the Sharps at Laurel Hill, in Louisiana.   In the conversation that ensued, plaintiff inquired of Sharp if he also could get work.   The testimony is conflicting as to just what Sharp told plaintiff. Sharp testifies (quoting): "I told him I would let him know." Plaintiff testifies Sharp said, "Yes, I might not be able to give you anything but 'doodling sawdust' until something opens up."   Since reading this testimony again, we are of the opinion that it is too indefinite to be construed as a contract.

During the conversation above referred

to, plaintiff told Sharp that he had worked for Mr. Wemple, on whose place plaintiff was then residing, as a sawyer, and that he could do any kind of work around a sawmill. Three days later, on December 29th, plaintiff accompanied his son to Laurel Hill where the latter went to begin driving a truck for the Sharps for which B. J. Sharp had hired him. On that trip, so plaintiff testifies, he stayed all night with B. J. Sharp, and while there in Sharp's home at Laurel Hill, Sharp asked him how long it would be before he "come over to go to work," and plaintiff replied (quoting): "I couldn't say definitely, but I want to be back on the 14th day of January following." Sharp testifies in one place that plaintiff did not call on him at Laurel Hill. Again he says he does not recall that plaintiff spent the night with him. He testified he did not even recall the date nor the occasion when plaintiff's son moved to Laurel Hill. M. T. Barnidge testified he stayed at B. J. Sharp's the night of December 29th, and that plaintiff also stayed there; that he was present and heard the conversation between plaintiff and Sharp relative to plaintiff's going to work for Sharp, and heard Sharp tell plaintiff he could use him as soon as he (plaintiff) could locate at Pitkin and get back down there, and that plaintiff agreed to come back. The occasion of Sharp's testimony above referred to was while plaintiff had him called for cross examination at beginning of plaintiff's testimony in chief. Sharp was later called and testified as a witness for the defense, and did not deny Barnidge's testimony except that he was asked if he remembered whether plaintiff came over to Laurel Hill and had a talk with him and he replied: "No, I don't. We were busy and moving." Owing to the apparent evasive manner in which Sharp answered questions, his pretending not to remember circumstances which in all reason he should have remembered, and failure to specifically deny Barnidge's testimony when he had an opportunity to do so, we are inclined to believe plaintiff's version of this conversation rather than Sharp's.

Yet this testimony does not show any particular job Sharp agreed to give plaintiff on that occasion. The only thing he did was to inquire when plaintiff would report back to work and plaintiff agreed to report back on January 14th. We do not think it can be said that there was any contract entered into on that occasion, for the want of certainty as to the object of the alleged agreement. We think before it can be said that a contract was entered into between these parties, it would have been necessary that some certain object, such for instance as that plaintiff was to be given the position as sawyer, be agreed upon. The testimony does not definitely show this.

The next communication had between plaintiff and B. J. Sharp was a few days before the 14th of January, 1929, the date previously agreed upon for plaintiff to report back for work, when plaintiff received a letter from Sharp, written from Woodville, Mississippi, addressed to plaintiff at Pitkin, Louisiana, telling plaintiff, so plaintiff testifies, that his sawyer at Woodville had quit and he wanted plaintiff to come at once and go to work and take the sawyer's place. Plaintiff also testifies that he wrote and mailed a letter immediately to Mr. Sharp agreeing to come and requested Sharp to send him money to pay his way over there. Sharp mailed plaintiff a check for $10 a few days later in response to plaintiff's request, but before it reached him he had an opportunity to go free of expenses with his son, Monroe Durrett, who was returning to Woodville from a trip he

506

had made to plaintiff's vicinity about that time. Sharp testifies he did not write plaintiff his sawyer had quit and wanted plaintiff to come and take his place, but that he wrote him (quoting): "I told him if he would come over there I could use him, give him a job." Monroe Durrett testifies that when he left Woodville to go to the vicinity of his father's, Mr. Sharp told him to bring his father back with him if he saw him. Sharp, on cross examination, first testified he did not recall the occasion of Monroe Durrett's going to the vicinity of plaintiff as testified about; that he did not recall telling young Durrett to see his father and bring him back. Still again, being asked how it was, Sharp says he did tell young Durrett to tell his father to come on over and that if he had not already left for Mississippi, for Monroe to bring him back with him. It appears from the manner of Sharp's testimony he is unwilling to frankly admit just what he did write plaintiff, and admits unwillingly that he even sent for him by young Monroe Durrett. From the testimony as a whole on this point we think it clear that Sharp's letter to plaintiff was a call to plaintiff to come and take the job as a sawyer at the Sharps' sawmill; that it amounted to an offer of employment, and that plaintiff's reply was an acceptance. While the amount plaintiff was to receive as wages was not mentioned, no doubt Sharp expected to give and plaintiff expected to receive the amount Sharp was then paying his sawyer, which it developed later was $5 per day. That much of the agreement was necessarily implied. We therefore think there was created at this time a contract of employment between plaintiff and the Sharps. The fact that plaintiff reported to Sharp a few days later, January 18th, and without further negotiations was put to work by Sharp operating one of his saws, corroborates plain-

tiff's contention that a contract had been entered into.

At this time B. J. Sharp was living at Woodville in the state of Mississippi and the Sharp brothers had moved their saw-. mill, logging outfit and crew of workmen from Laurel Hill, Louisiana, across the line into the state of Mississippi to Woodville, in that state, where they had set up and were operating their sawmill, and were cutting and logging timber in that state, supplying their sawmill in that state. To all appearances, so far as the testimony shows, this new location was altogether separate and distinct from the former location and operations at Laurel Hill in Louisiana. It was a different tract of timber, and a new location for their sawmill.

Mr. Woodland, secretary and treasurer of Eicher-Woodland, testifies that his company operated a sawmill at Laurel Hill in 1928 up until about the middle of November when they closed down and moved to Woodville, Mississippi, where they started building a new mill and logging operations about the middle of November; that by the first of January, 1929, his company had no employees in Louisiana, except their office force in their sales office at Alexandria, Louisiana. While he does not testify directly that his company maintained an office at Woodville, he says they operated a mill there. He speaks of their office being burned down in the latter part of 1929. It is, therefore, to be presumed that he had an office in Woodville. He testifies that his sawmill operations at Woodville constituted a separate and distinct plant from the mill formerly operated by the Sharps at Woodville. He also testifies that the Woodville plant was separate and distinct from his Alexandria office; that his Alexandria office was used solely as a sales office. He also says his sawmill

plant at Woodville is still being operated; that he has operated no sawmills in Louisiana since closing down his mill at Laurel Hill in November, 1928.

The Sharps owned and operated their sawmill at Laurel Hill, closed it down in November, 1928, moved it to Mississippi, where they set it up and began cutting, logging and manufacturing timber belonging to Eicher-Woodland about the first of January, 1929. They were under a contract with Eicher-Woodland for a certain agreed price for the lumber as delivered. The testimony does not show that the Sharps ever moved their mill and logging operations back into Louisiana after leaving the state the latter part of 1928 or first of 1929.

These two industries—the Eicher-Woodland and the Sharps, appear to have discontinued operations in Louisiana altogether, and moved to Mississippi, and have never returned to this state. This removal had already taken place before plaintiff was employed. Plaintiff was employed to work in the state of Mississippi, for an established industry in that state, and received his injuries while so employed there.

So far as the question of when, where and how plaintiff was employed is concerned, we now think, after again examining the testimony and the law applicable, makes little difference. We think the location of the industry where plaintiff was to perform the services has more to do with his right of recovery than the place where he was employed. B. J. Sharp, the employer, living at Woodville, Mississippi, wrote from his home there, to plaintiff at plaintiff's home at Pitkin, Louisiana, offering plaintiff a position as sawyer at Sharp's sawmill at or near Woodville. Plaintiff replied accepting the offer and reported for work a few days later. It

would have made no difference if Sharp had gone to Louisiana and employed plaintiff at Pitkin, or plaintiff had gone to Sharp at Woodville and there entered into an agreement of employment. The industry where plaintiff was to work was located in Mississippi, was essentially a Mississippi industry, was subject to the laws of that state, and plaintiff under these circumstances, when injured, would have to recover, if at all, under the laws of that state.

It is significant that neither of these industries ever moved back to Louisiana. Nothing is shown as to what became of the business carried on by the Sharps. It is not shown that they ever moved their operations back to Louisiana. It is shown that the Eicher-Woodland operations, or the sawmill plant moved by it from Louisiana to Mississippi, is still being carried on at Woodville, where it was established the latter part of 1928.

It is also a fact that plaintiff was never at any time an employee of Eicher-Woodland, but was in the employ of the Sharps, who were engaged in maintaining and operating an industry of their own, that of logging and lumbering; and since their entire operations were in Mississippi at the time plaintiff was employed, and when he received his injuries, and since the Sharps' relations with Eicher-Woodland, whatever they may have been at the time, were wholly within the state of Mississippi, we do not think plaintiff's right of recovery for his injuries can even be remotely governed by the Employers' Liability Law of Louisiana (Act No. 20 of 1914, as amended). The Sharps were delivering the lumber which they manufactured to Eicher-Woodland at its place of business in Mississippi. So far as the record discloses, none of the lumber was sent back to the

Eicher-Woodland sales office in Alexandria, Louisiana. It may be that by correspondence through the Alexandria office, sales were found for the lumber in various markets throughout the country, but from that fact it cannot be construed that the business carried on by the Sharps was a Louisiana business or industry, nor that Eicher-Woodland's was a Louisiana business.

Eicher-Woodland had obtained a permit to enter Mississippi and carry on its business in that state; had a regular designated agent to represent it there in matters of litigation. It no doubt paid taxes to that state on its property and industry there, just as all other corporations carrying on a business or industry in that state. The Sharps no doubt were also subject to payment of taxes on their sawmill and logging outfit established in that state.

While it is true that the Employers' Liability Act of Louisiana should be liberally construed, we think it clear that it is wholly out of the question to put such a construction upon it as to make it apply to cases of this kind.

Plaintiff's able counsel has cited, as controlling, the case of Hargis v. McWilliams, 9 La. App. 108, 119 So. 88. In that case, the plaintiff was sent to Florida to perform some special repair job of work. His employer did not go to Florida and set up a business as a going industry, did not move his business to that state, but his business remained established and located in Louisiana. The work plaintiff in that case was sent out of the state to do was only temporary. We do not think the facts in that case applicable to the present one.

We have been unable to find a case from Louisiana similar to this one, and have been cited to none by counsel.

Counsel for defendant has cited some cases from other states which present a state of facts similar to the present case, and the views there held are in accord with the views as herein expressed.

In Watts v. Long, 116 Neb. 656, 218 N. W. 410, 59 A. L. R. 728, the court laid down the following principle of law:

"The Employers' Liability Law of this state (Laws 1913, c. 198, as amended) is not applicable to a nonresident employer and resident employee, where the contract of employment was made in this state for services to be performed in another state, and the employer was not, at the time of the contract, engaged in any trade, business, profession, or avocation in this state.

"Such law is applicable where the employer is engaged in any trade, business, profession, or avocation in this state and the employee, while performing work incident to such business in another state, is there injured"—citing New York C. R. Co. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629; Mountain Timber Co. v. Washington, 243 U. S. 219, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642.

The latter paragraph above quoted sets forth the application of the extraterritorial power of the Employers' Liability Law. The Hargis case is an example of its application in this state. The Watts v. Long case, above referred to and those cited in connection with it, not only recognize this extraterritorial power of the Workmen's Compensation Law of the various states which have the law, but it also holds that such a law is not applicable to a non-resident employer and resident employee where the services to be performed are in another state, and the employer was not, at the time of the contract, engaged in any trade or business in the state of the resident employee, as set out in the first paragraph above quoted from the decision. And this, according to the decision, is true, even in cases where the contract of employment

is made in the state of the employee's residence.

Clearly, the Sharps, who were the employers of plaintiff, were residents of Mississippi at the time the contract of employment was entered into; and it is equally certain that the services to be performed were in that state, also the Sharps were not engaged at the time in any trade or business in the state of Louisiana. There is no evidence to show that the Sharps ever moved their operations back to this state. To all appearances, when they moved their business out of this state and established in Mississippi, it was a permanent move.

The business carried on by the Sharps was an independent business of their own. They hired and fired their employees, and conducted their business in their own way. The only connection they apparently had with Eicher-Woodland was some kind of an independent contract under which they cut and manufactured certain timber belonging to that company, for which they received a stipulated price per thousand feet delivered at the company's mill or place of business in that vicinity. Clearly they were independent contractors and owned and operated their own mill and logging outfit and employed their own labor.

Under the circumstances as above outlined, clearly plaintiff would have no rights under the Louisiana Employers' Liability Act to recover from the Sharps. And his right to recover from Eicher-Woodland would, we think, be governed or determined from his relations toward his employer, the Sharps; hence he has no rights as against the Eicher-Woodland.

As previously stated, we do not think the place where the contract of employment was entered into is decisive. In fact, it would have little to do in determining whether plaintiff's claim comes under the act. It frequently happens that employers of businesses and industries of various kinds go or send into other states than that where such businesses are located to employ their labor.

The Long Bell Lumber Company, for example, which has a large sawmill in Longview, in the state of Washington, might write or send here to Louisiana, where it has in the past operated several sawmills, and employ some of its old Louisiana men and take them or pay their way to Longview and put them to work in its mill there. If one of them should be injured while working there, his right to recover would be governed by the laws of the state of Washington, and not that of Louisiana.

The location of the industry is important.

In the Watts v. Long case, above quoted from, which is very similar to the present case, the court used the following language:

"The general rule is well established that, where the place of the contract and place of performance are the same, the law of the place where made will govern the contract; but it is equally well established that, where the contract is made in one place to be executed in another, it will be governed by the law of the place of performance."

It is our view, since making a further examination of the testimony in this case, and of the law applicable, that we were in error in our former holdings, and we now conclude that plaintiff's claim does not come under the Employers' Liability Act of Louisiana, and we so hold.

Therefore, for the reasons assigned, our former opinion is recalled and set aside, and the judgment of the lower court is reinstated and made the judgment of this court, and it is so ordered.