### DURRETT v. EICHER–WOODLAND LUMBER CO., Inc., et al.

### No. 3966.

Court of Appeal of Louisiana. Second Circuit.

Feb. 16, 1932.

For former opinion, see 136 So. 112.

Sidney I. Foster, of Leesville, for appellant.

Pujo, Bell & Hardin, of Lake Charles, and White, Holloman & White, of Alexandria, for appellees.

CULPEPPER, J.

This case is on rehearing upon application of defendants appellees. Our former opinion, rendered July 14th last, reversed the judgment of the lower court, which rejected plaintiff's demands, and rendered judgment for plaintiff.

Defendants, in their application for a rehearing, contend that the court erred in holding that the contract of employment alleged upon was entered into in Louisiana. It is contended that the testimony as to the conversation had between plaintiff and B. J. Sharp, one of the defendants, at the former's home at Cheneyville, La., did not constitute a contract as was held by this court; that neither did the interchange of letters or telegrams between Sharp and the plaintiff while plaintiff was at Pitkin, La., and while Sharp was at Woodville, in Mississippi, amount to a contract.

Defendants further contend that, even though the contract was entered into in Louisiana, the laws of Mississippi, and not those of Louisiana, should apply to this case, for the reason that Eicher-Woodland Lumber Company, Inc., had fixed its domicile in Mississippi and had appointed a state agent in that state, thereby accepting the benefits and burdens of that state; hence the court erred in holding that the laws of that state did not apply; that the court erred in considering the fact that all parties concerned were resi-

dents of and domiciled in Louisiana; that such is not necessary or even incident to a decision of the facts; that the court erred in holding that Eicher-Woodland Lumber Company, Inc., had a blanket contract with the Sharps to convert its timber in Louisiana and Mississippi into lumber, when in truth and in fact when this contract was made for work in Mississippi with the Sharps the Eicher-Woodland Lumber Company, Inc. had no timber in Louisiana; that the court erred in holding that this contract, if any had, was to be performed on either side of the state line; in fact it was only to be performed in Mississippi.

For brevity the court will hereafter refer to Eicher-Woodland Lumber Company, Inc., as Eicher-Woodland, and to B. J. Sharp and J. R. Sharp as the Sharps.

■ As to the question of whether the contract alleged upon was entered into in Louisiana, the testimony shows substantially as follows: On December 26, 1928, B. J. Sharp, a member of the partnership of B. J. Sharp and J. R. Sharp, came to the home of plaintiff near Cheneyville in Louisiana to hire Monroe Durrett, plaintiff's son, as a truck driver for the Sharps at Laurel Hill, in Louisiana. In the conversation that ensued, plaintiff inquired of Sharp if he also could get work. The testimony is conflicting as to just what Sharp told plaintiff. Sharp testifies (quoting), "I told him I would let him know." Plaintiff testifies Sharp said, "Yes, I might not be able to give you anything but 'doodling sawdust' until something opens up." Since reading this testimony again, we are of the opinion that it is too indefinite to be construed as a contract.

During the conversation above referred to, plaintiff told Sharp that he had worked for Mr. Wemple, on whose place plaintiff was then residing, as a sawyer, and that he could do any kind of work around a sawmill. Three days later, on December 29th, plaintiff accompanied his son to Laurel Hill, where the latter went to begin driving a truck for the Sharps for which B. J. Sharp had hired him. On that trip, so plaintiff testifies, he stayed all night with B. J. Sharp, and while there in Sharp's home at Laurel Hill Sharp asked him how long it would be before he "come over to go to work," and plaintiff replied (quoting), "I couldn't say definitely, but I want to be back on the 14th day of January following." Sharp testifies in one place that plaintiff did not call on him at Laurel Hill. Again he says he does not recall that plaintiff spent the night with him. He testified he did not even recall the date nor the occasion when plaintiff's son moved to Laurel Hill. M. T. Barnidge testified he stayed at B. J. Sharp's the night of December 29th, and that plaintiff also stayed there, that he was present and heard the conversation between plain-

tiff and Sharp relative to plaintiff's going to work for Sharp, and heard Sharp tell plaintiff he could use him as soon as he (plaintiff) could locate at Pitkin and get back down there, and that plaintiff agreed to come back. The occasion of Sharp's testimony above referred to was while plaintiff had him called for cross-examination at beginning of plaintiff's testimony in chief. Sharp was later called and testified as a witness for the defense, and did not deny Barnidge's testimony except that he was asked if he remembered whether plaintiff came over to Laurel Hill and had a talk with him, and he replied: "No, I don't. We were busy and moving." Owing to the apparent evasive manner in which Sharp answered questions, his pretending not to remember circumstances which in all reason he should have remembered, and failure to specifically deny Barnidge's testimony when he had an opportunity to do so, we are inclined to believe plaintiff's version of this conversation rather than Sharp's.

Yet this testimony does not show any particular job Sharp agreed to give plaintiff on that occasion. The only thing he did was to inquire when plaintiff would report back to work and plaintiff agreed to report back on January 14th. We do not think it can be said that there was any contract entered into on that occasion, for the want of certainty as to the object of the alleged agreement. We think before it can be said that a contract was entered into between these parties, it would have been necessary that some certain object, such for instance as that plaintiff was to be given the position as sawyer, be agreed upon. The testimony does not definitely show this.

The next communication had between plaintiff and B. J. Sharp was a few days before the 14th of January, 1929, the date previously agreed upon for plaintiff to report back for work, when plaintiff received a letter from Sharp, written from Woodville, Miss., addressed to plaintiff at Pitkin, La., telling plaintiff, so plaintiff testifies, that his sawyer at Woodville had quit and he wanted plaintiff to come at once and go to work and take the sawyer's place. Plaintiff also testifies that he wrote and mailed a letter immediately to Mr. Sharp agreeing to come and requested Sharp to send him money to pay his way over there. Sharp mailed plaintiff a check for $10 a few days later in response to plaintiff's request, but before it reached him he had an opportunity to go free of expenses with his son, Monroe Durrett, who was returning to Woodville from a trip he had made to plaintiff's vicinity about that time. Sharp testifies he did not write plaintiff his sawyer had quit and wanted plaintiff to come and take his place, but that he wrote him (quoting), "I told him if he would come over there I could use him, give him a job." Monroe Durrett tes-

tifies that when he left Woodville to go to the vicinity of his father's, Mr. Sharp told him to bring his father back with him if he saw him. Sharp, on cross-examination, first testified he did not recall the occasion of Monroe Durrett's going to the vicinity of plaintiff as testified about; that he did not recall telling young Durrett to see his father and bring him back. Still again being asked how it was, Sharp says he did tell young Durrett to tell his father to come on over, and that, if he had not already left for Mississippi, for Monroe to bring him back with him. It appears from the manner of Sharp's testimony he is unwilling to frankly admit just what he did write plaintiff, and admits unwillingly that he even sent for him by young Monroe Durrett. From the testimony as a whole on this point we think it clear that Sharp's letter to plaintiff was a call to plaintiff to come and take the job as a sawyer at the Sharps' sawmill, that it amounted to an offer of employment, and that plaintiff's reply was an acceptance. While the amount plaintiff was to receive as wages was not mentioned, no doubt Sharp expected to give and plaintiff expected to receive the amount Sharp was then paying his sawyer, which it developed later was $5 per day. That much of the agreement was necessarily implied. We therefore think there was created at this time a contract of employment between plaintiff and the Sharps. The fact that plaintiff reported to Sharp a few days later, January 18th, and without further negotiations was put to work by Sharp operating one of his saws corroborates plaintiff's contention that a contract had been entered into.

At this time B. J. Sharp was living at Woodville in the state of Mississippi, and the Sharp brothers had moved their sawmill, logging outfit, and crew of workmen, from Laurel Hill, La., across the line into the state of Mississippi to Woodville, in that state, where they had set up and were operating their sawmill, and were cutting and logging timber in that state, supplying their sawmill in that state. To all appearances, so far as the testimony shows, this new location was altogether separate and distinct from the former location and operations at Laurel Hill in Louisiana. It was a different tract of timber, and a new location for their sawmill.

Mr. Woodland, secretary and treasurer of Eicher-Woodland, testifies that his company operated a sawmill at Laurel Hill in 1928 up until about the middle of November when they closed down and moved to Woodville, Miss., where they started building a new mill and logging operations about the middle of November; that by the 1st of January, 1929, his company had no employees in Louisiana, except their office force in their sales office at Alexandria, La. While he does not testify directly that his company maintained an office

at Woodville, he says they operated a mill there. He speaks of their office being burned down in the latter part of 1929. It is therefore to be presumed that he had an office in Woodville. He testifies that his sawmill operations at Woodville constituted a separate and distinct plant from the mill formerly operated by the Sharps at Woodville. He also testifies that the Woodville plant was separate and distinct from his Alexandria office; that his Alexandria office was used solely as a sales office. He also says his sawmill plant at Woodville is still being operated; that he has operated no sawmills in Louisiana since closing down his mill at Laurel Hill in November, 1928.

The Sharps owned and operated their sawmill at Laurel Hill, closed it down in November, 1928, moved it to Mississippi, where they set it up and began cutting, logging, and manufacturing timber belonging to Eicher-Woodland about the 1st of January, 1929. They were under a contract with Eicher-Woodland for a certain agreed price for the lumber as delivered. The testimony does not show that the Sharps ever moved their mill and logging operations back into Louisiana after leaving the state the latter part of 1928 or first of 1929.

These two industries, the Eicher-Woodland and the Sharps, appear to have discontinued operations in Louisiana altogether, and moved to Mississippi, and have never returned to this state. This removal had already taken place before plaintiff was employed. Plaintiff was employed to work in the state of Mississippi for an established industry in that state, and received his injuries while so employed there.

■ So far as the question of when, where, and how plaintiff was employed is concerned, we now think, after again examining the testimony and the law applicable, makes little difference. We think the location of the industry where plaintiff was to perform the services has more to do with his right of recovery than the place where he was employed. B. J. Sharp, the employer, living at Woodville, Miss., wrote from his home there to plaintiff at plaintiff's home at Pitkin, La., offering plaintiff a position as sawyer at Sharp's sawmill at or near Woodville. Plaintiff replied accepting the offer and reported for work a few days later. It would have made no difference if Sharp had gone to Louisiana and employed plaintiff at Pitkin, or plaintiff had gone to Sharp at Woodville and there entered into an agreement of employment. The industry where plaintiff was to work was located in Mississippi, was essentially a Mississippi industry, was subject to the laws of that state, and plaintiff under these circumstances, when injured, would have to recover, if at all, under the laws of that state.

870

It is significant that neither of these industries ever moved back to Louisiana. Nothing is shown as to what became of the business carried on by the Sharps. It is not shown that they ever moved their operations back to Louisiana. It is shown that the Eicher-Woodland operations, or the sawmill plant moved by it from Louisiana to Mississippi, is still being carried on at Woodville, where it was established the latter part of 1928.

■ It is also a fact that plaintiff was never at any time an employee of Eicher-Woodland, but was in the employ of the Sharps, who were engaged in maintaining and operating an industry of their own, that of logging and lumbering; and, since their entire operations were in Mississippi at the time plaintiff was employed, and when he received his injuries, and since the Sharps' relations with Eicher-Woodland, whatever they may have been at the time, were wholly within the state of Mississippi, we do not think plaintiff's right of recovery for his injuries can even be remotely governed by the Employers' Liability Law of Louisiana (Act No. 20 of 1914 as amended). The Sharps were delivering the lumber which they manufactured to Eicher-Woodland at its place of business in Mississippi. So far as the record discloses, none of the lumber was sent back to the Eicher-Woodland sales office in Alexandria, La. It may be that by correspondence through the Alexandria office sales were found for the lumber in various markets throughout the country, but from that fact it cannot be construed that the business carried on by the Sharps was a Louisiana business or industry, nor that Eicher-Woodland's was a Louisiana business.

Eicher-Woodland had obtained a permit to enter Mississippi and carry on its business in that state; had a regular designated agent to represent it there in matters of litigation. It no doubt paid taxes to that state on its property and industry there, just as all other corporations carrying on a business or industry in that state. The Sharps no doubt were also subject to payment of taxes on their sawmill and logging outfit established in that state.

■ While it is true that the Employers' Liability Act of Louisiana should be liberally construed, we think it clear that it is wholly out of the question to put such a construction upon it as to make it apply to cases of this kind.

Plaintiff's able counsel has cited, as controlling, the case of Hargis v. McWilliams, 9 La. App. 108, 119 So. 88. In that case, the plaintiff was sent to Florida to perform some special repair job of work. His employer did not go to Florida and set up a business as a going industry, did not move his business to that state, but his business remained established and located in Louisiana. The work plaintiff in that case was sent out of the state to do was only temporary. We do not think the facts in that case applicable to the present one.

We have been unable to find a case from Louisiana similar to this one, and have been cited to none by counsel.

Counsel for defendant has cited some cases from other states which present a state of facts similar to the present case, and the views there held are in accord with the views as herein expressed.

In Watts v. Long, 116 Neb. 656, 218 N. W. 410, 59 A. L. R. 728, the court laid down the following principle of law:

"The Employers' Liability Law of this state (Laws 1913, c. 198, as amended) is not applicable to a nonresident employer and resident employee, where the contract of employment was made in this state for services to be performed in another state, and the employer was not, at the time of the contract, engaged in any trade, business, profession, or avocation in this state.

"Such law is applicable where the employer is engaged in any trade, business, profession, or avocation in this state and the employee, while performing work incident to such business in another state, is there injured"—citing New York C. R. Co. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629, Mountain Timber Co. v. Washington, 243 U. S. 219, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642.

The latter paragraph above quoted sets forth the application of the extraterritorial power of the Employers' Liability Law. The Hargis Case is an example of its application in this state. The Watts v. Long Case, above referred to and those cited in connection with it, not only recognize this extraterritorial power of the Workmen's Compensation Law of the various states which have the law, but it also holds that such a law is not applicable to a nonresident employer and resident employee where the services to be performed are in another state, and the employer was not, at the time of the contract, engaged in any trade or business in the state of the resident employee, as set out in the first paragraph above quoted from the decision. And this, according to the decision, is true, even in cases where the contract of employment is made in the state of the employee's residence.

■ Clearly, the Sharps, who were the employers of plaintiff, were residents of Mississippi at the time the contract of employment was entered into; and it is equally certain that the services to be performed were in that state, also the Sharps were not engaged at the time in any trade or business in the state of Louisiana. There is no evidence

to show that the Sharps ever moved their operations back to this state. To all appearances, when they moved their business out of this state and established in Mississippi, it was a permanent move.

The business carried on by the Sharps was an independent business of their own. They hired and fired their employees, and conducted their business in their own way. The only connection they apparently had with Eicher-Woodland was some kind of an independent contract under which they cut and manufactured certain timber belonging to that company, for which they received a stipulated price per thousand feet delivered at the company's mill or place of business in that vicinity. Clearly they were independent contractors and owned and operated their own mill and logging outfit and employed their own labor.

Under the circumstances as above outlined, clearly plaintiff would have no rights under the Louisiana Employers' Liability Act to recover from the Sharps. And his right to recover from Eicher-Woodland would, we think, be governed or determined from his relations toward his employer, the Sharps; hence he has no rights as against the Eicher-Woodland.

As previously stated, we do not think the place where the contract of employment was entered into is decisive. In fact, it would have little to do in determining whether plaintiff's claim comes under the act. It frequently happens that employers of businesses and industries of various kinds go or send into other states than that where such businesses are located to employ their labor.

The Long Bell Lumber Company, for example, which has a large sawmill in Longview, in the state of Washington, might write or send here to Louisiana, where it has in the past operated several sawmills, and employ some of its old Louisiana men and take them or pay their way to Longview and put them to work in its mill there. If one of them should be injured while working there, his right to recover would be governed by the laws of the state of Washington, and not that of Louisiana.

The location of the industry is important.

In the Watts v. Long Case, above quoted from, which is very similar to the present case, the court used the following language: "The general rule is well established that, where the place of the contract and place of performance are the same, the law of the place where made will govern the contract; but it is equally well established that, where the contract is made in one place to be executed in another, it will be governed by the law of the place of performance."

It is our view, since making a further examination of the testimony in this case, and of the law applicable, that we were in error in our former holdings, and we now conclude that plaintiff's claim does not come under the Employers' Liability Act of Louisiana, and we so hold.

Therefore, for the reasons assigned, our former opinion is recalled and set aside, and the judgment of the lower court is reinstated and made the judgment of this court, and it is so ordered.