**SELSER et al. v. BRAGMANS BLUFF LUMBER CO., Inc.\***

No. 14483.

Court of Appeal of Louisiana. Orleans.
March 13, 1933.

Rosen, Kammer, Wolff & Farrar, of New Orleans, for appellant.

St. Clair Adams and St. Clair Adams, Jr., and Gordon Boswell, all of New Orleans, for appellees.

HIGGINS, Judge.

This is a suit for compensation for the death of William L. Selser, brought jointly by his widow, individually, and also on behalf of her minor son, Bruce O. Lilleton, issue of her previous marriage, and also by I. M. Selser, as the guardian of the minors, Will Lindsey Selser and Elizabeth Selser, children of the deceased by a former marriage.

The petition alleges, in substance, that there were no children born of the second marriage, but that the widow had one child by a previous marriage born February 15, 1917, and deceased left two children by a former marriage, one born May 28, 1916, and the other on July 24, 1917; that I. M. Selser, a resident of East St. Louis, Ill., was duly appointed as guardian of these two children by the probate court of St. Clair county, Ill., and letters of guardianship properly issued; that the widow and the said minor children were solely dependent upon the deceased at the time of his death; that the defendant is a Louisiana corporation domiciled in the city of New Orleans; that it is engaged in the logging and lumber business in this state and

the Republic of Nicaragua; that on May 10, 1927, at New Orleans, the defendant, in writing, employed the deceased as a stenographer at a salary of $150 a month, his services to be performed in Nicaragua; that later he was promoted to a position of general inspector of all equipment, tools, and properties of the company at a salary of $225 a month, which position he was occupying and salary he was receiving at the time of his death; that the country around the town of Puerta Cabezas, Nicaragua, where the deceased rendered his services, was sparsely settled, remote, isolated, and inhabited by semicivilized natives, some of whom had organized themselves into bands of bandits, who preyed upon the small towns; that because of the hazard and danger created by the bandits the United States marines were stationed in that locality and a militia was organized by the local authorities; that during the early part of the year 1931 the raids by the bandits were frequent, necessitating the defendant furnishing its employees with arms for the purpose of protecting themselves against violence and the company's property against depredation and theft by the bandits; that the deceased's employment required him to visit numerous company properties in the interior in order to check its equipment and tools, and that the company furnished him a motorcar with a native operator for the purpose of going over its railroad lines in order to perform his duties; that in the early morning of April 11, 1931, while acting in the course and scope of his employment, the deceased started to visit one of the interior plantations at Logtown and learned that it had been raided by bandits the previous night; that deceased started back to Puerta Cabezas, but was met by the United States Marines and the local militia proceeding in the direction of the raid and he and other employees of the company started back toward the plantation which had been raided; that en route the party was ambushed by the outlaws, with the result that the captain of the marines and a member of the militia were killed, and deceased was mortally wounded and died on April 14, 1931, at Puerta Cabezas; and that deceased was killed while acting within the course and scope of his employment. Petitioners prayed for the maximum amount of compensation of $20 a week for 300 weeks, to be proportioned among the dependents by the court, and for 20 per cent. attorney's fee not to exceed $1,000.

Defendant filed an exception of want of authority and capacity on the part of I. M. Selser to represent the said minors and stand in judgment. Defendant also filed an exception of no right or cause of action. These exceptions were overruled and defendant answered and admitted the deceased's employment, his salary, and his death at the hands of the bandits, as alleged, but denied that the company furnished arms to its employees and instructed them to defend the company's property against outlaws; that there were frequent raids by the bandits upon the company's property, and that the deceased was killed while acting in the course and scope of his employment. Defendant claimed a credit of $990.50 covering funeral charges, drayage, and $675.00 cash, which was voluntarily paid to Mrs. Selser after her husband's death.

There was judgment in favor of the plaintiffs, as prayed for, subject to a credit of $675, and the defendant has appealed.

The exception of want of capacity to stand in judgment by the guardian is predicated upon the provisions of paragraphs G and H of subsection 2 of section 8, p. 360, of Act 242 of 1928, which read as follows:

"(G) Where there is a surviving widow, widower and child or children, entitled to compensation, the compensation above described shall be paid entirely to the widow or widower for the common benefit of such widow or widower and child or children, and the appointment of a tutor not be necessary. Where there is no surviving parent, and a child who is entitled to compensation, payment shall be made to the duly appointed tutor.

"(H) The term 'child' or 'children' shall cover only legitimate children, step-children, posthumous children, adopted children and illegitimate children acknowledged under the provisions of Civil Code Article 203, 204 and 205. The term 'brother' and 'sister' shall include step-brothers and step-sisters, and brothers and sisters by adoption."

Counsel for defendant argues that, as paragraph H specifically provides that the term "child or children" shall cover step-children, and paragraph G provides that, where the surviving widow and child or children are entitled to recover, the compensation shall be paid entirely to the widow for the common benefit of the widow and child or children, the suit should have been brought, in behalf of all the minors, by the step-mother.

Counsel for plaintiff counters by pointing out that the last sentence of paragraph G provides that, where there is no surviving parent, the compensation due the child or children shall be paid to the duly appointed tutor. He contends that the words "surviving parent" refer to the natural parent and not to a step-parent, and, as both natural parents of the two children of the deceased by his former marriage are dead, that I. M. Selser, the guardian, has the right to sue for and receive any compensation due them.

In death cases the payment of compensation is predicated upon the dependency of the designated surviving relatives or parties. The theory of the statute is to provide the means for support and maintenance of those

who have been deprived thereof by the death of the deceased in a hazardous employment. This is particularly true in the cases of widows and minor children who were solely dependent upon the husband and father respectively. Instead of permitting these dependents, who are unable to provide for themselves, to become public charges, the theory of the Compensation Act is to place the burden of their maintenance and support upon the industry as a whole. Since this is true, it would seem absurd to say that the Legislature intended to place the exclusive right of suing for and receiving compensation in a death case, where there is a stepmother, in such stepmother, when she has never had the custody and possession of the dependent children of a previous marriage of the deceased. To hold that the stepmother, under those circumstances, would have the exclusive right to sue for and receive the compensation due the dependent minors when they have been constantly in the possession and custody of the maternal or paternal relatives, and have never been in the custody of the stepmother, would be to defeat the very purpose of the statute, because the compensation would be paid to a person who has never had any interest whatsoever in the maintenance and support of the dependent minors. Surely it would not be for the "common benefit" of the minors to pay the money to her. For instance, a man is married three times in this state. By his first marriage he has three children. His wife divorces him and secures the custody and possession of the children. He then marries a second time and there are two children born of this union. The second wife dies and the children are placed in the care of the maternal grandparents. He then marries a third time, but no children are born of the marriage. He is killed under circumstances which involve the liability of his employer under the statute. The widow and all of the minor children were dependents of and supported by the deceased. Could the court possibly hold that the exclusive right to sue for and receive compensation in behalf of the minor children was lodged in the surviving spouse as widow and stepmother of the minors? We think not. In such a case, if the natural mother of the minors of the first marriage and the maternal grandparents, who have the custody of the children of the second marriage, joined with the widow of the third marriage in' claiming compensation for the joint benefit of all the dependents, we do not believe that the defendant could complain, particularly if those representing the respective minors had qualified as tutor or tutrix of them.

For us to construe the language in question as giving the widow, as stepmother, the exclusive right to claim compensation in behalf of the minor children of a prior marriage, whom she has never had the custody and possession of, particularly where the nat-

ural mother of such children is living, and has qualified as tutrix, would be practically repealing the articles of the Revised Civil Code with reference to the tutorship of minors, where compensation cases are concerned. Rev. Civil Code, art. 246, et seq.

Paragraph 4 of section 18 of Act No. 20 of 1914, in part, reads as follows: "The judge shall not be bound by the usual common law or statutory rules of evidence or by any technical or formal rules of procedure other than as herein provided."

The provision in paragraph G, hereinbefore quoted, that the appointment of a tutor is not necessary where there is a surviving parent, indicates it was the intention of the Legislature to make the proceedings simple and inexpensive.

It would seem to us that the language of the first sentence of paragraph G would cover a case where the stepchildren are living with their stepmother at the time of their father's demise. In such case the stepmother would be entitled to sue for and receive the compensation due to stepchildren in order to maintain and support them, but where the stepchildren have never lived with the stepmother, but constantly resided with the paternal relatives, as in the instant case, we feel that the second sentence of paragraph G is particularly applicable, and the duly appointed and qualified guardian, who has the custody and care of the dependent minor children, is entitled to sue for and receive compensation due for their benefit. We do not think it was the legislative intent to give exclusive right to the stepmother to represent the minor stepchildren in bringing suit for compensation under those circumstances. When both natural parents of the children are dead and the stepmother has never had the custody of the stepchildren, we believe that the duly appointed and qualified guardian or tutor who has custody of those minors has a right to bring suit for compensation in their behalf and to stand in judgment therein. Millspaugh v. Opelousas Cotton Gin Co., 19 La. App. 78, 139 So. 666; Gospel v. Southern Carbon Co., 4 La. App. 272.

But in any event we might say that this is not a contest between the widow as stepmother and the guardian as to who has the exclusive right to represent the two minors in this proceeding. This is a joint suit by both of those parties asserting that they are entitled to compensation in behalf of the respective minors, and the prayer of the petition is that the court fix the proper proportion of compensation due them in the event they are successful in this litigation. The only interest that the defendant has in the matter is to make certain that, in the event it is held liable, it pays the compensation awarded by the court to the proper party, in order that it will not be required to make payment a second time. The only one who could be heard

to say that she has a preferential right over the guardian to represent the minors is the stepmother, and, since she joins in the suit and prays that the amount due the two minors be paid to the guardian, surely she would be estopped from claiming that the money was wrongfully paid to him under the circumstances.

The exception of no right or cause of action is based on the ground that the Compensation Statute should not be given extra territorial effect. It is conceded that the defendant is a Louisiana corporation, domiciled and doing business in the city of New Orleans, where it has its principal office, which has charge of the foreign division of the company, and that the main office represents the executive department, which determines the rules of policy for the operation and conduct of the company's foreign business and also forwards the necessary cash with which to meet its pay rolls. The details of the defendant's logging and sawmill business were directed by the company's manager at Puerta Cabezas, Nicaragua. The deceased was also a resident of the state of Louisiana, and the written contract of employment was entered into in the city of New Orleans. This contract, which is annexed to and made part of the petition, not only provided for the amount of the deceased's salary, but stipulated that he would be entitled to transportation from New Orleans to Nicaragua and return, and also made provision for his board and lodging while there. The contract further provided for one-half of the regular rate of transportation for the members of his family and one-fourth the rate for any child under twelve years of age.

Defendant contends that, while subsection 3 of section 3 of Act 20 of 1914 provides that the employer and employee shall have the right to elect not to come under the provisions of the statute, section 4 of the act is compulsory as far as the employer is concerned where the employer elects not to come under the statute, but the employee does not join in that election, because in that situation the provisions of section 4 deprive the employer of the defenses of assumption of risk, fellow-servant doctrine, contributory negligence, etc.; and therefore, while the form of the statute is elective, it is in substance a compulsory law. In this connection it is also pointed out that the Compensation Law does not contain any provision expressly giving it extraterritorial effect, and that the services of the deceased were to be rendered exclusively in Nicaragua. Defendant says that the general trend of the jurisprudence in this country, with reference to cases where the Compensation Act does not expressly provide that it shall have extraterritorial effect and is compulsory and the services are to be rendered entirely in a different country, is that the statute should not be given extraterritorial effect, citing Durrett v. Eicher-Woodland Lumber Co. et al., 19 La. App. 494–504, 136 So. 112, 140 So. 867; American Mutual Liability Ins. Co. v. McCaffrey (C. C. A.) 37 F.(2d) 870, 872 (in which writ was refused by the United States Supreme Court, 281 U. S. 751, 50 S. Ct. 354, 74 L. Ed. 1162).

Plaintiff argues that as the contract was entered into between the deceased, a resident of the state of Louisiana, and the defendant, a Louisiana corporation domiciled and doing business in this state, and the Compensation Statute does not restrict its provisions to accidents arising within the state of Louisiana, and, as it is an elective and not a compulsory statute, the parties entering into contracts of employment in the state of Louisiana, either verbally or in writing, are presumed by law to have elected to come within the provisions of the act, unless they expressly stipulated that the Compensation Statute should not be applicable, and that, therefore, the provisions of the act should be given extraterritorial effect and applied in the instant case, citing Hargis v. McWilliams, Inc., 9 La. App. 108, 119 So. 88, 89; Festervand v. Laster, 15 La. App. 159, 130 So. 634, 637; Watts v. Long, 116 Neb. 656, 218 N. W. 410, 59 A. L. R. 728; Bradford Elec. Light Co., Inc., v. Jennie M. Clapper, 286 U. S. 145, 52 S. Ct. 571, 574, 76 L. Ed. 1026.

From a reading of the decisions cited it appears that there is a conflict of authority on this question.

In Festervand v. Laster, supra, the Court of Appeal of the Second Circuit said: "The general rule is that, unless the act expressly provides for no extraterritorial effect, the Workmen's Compensation Act has extraterritorial effect; and if one be employed in Louisiana by a Louisiana concern to perform labor and be sent into another state to perform that labor and is injured or killed accidentally in the course of his employment in that other state, he or his dependents can collect compensation under the Louisiana law, although the work was being performed in another state and the injury or death occurred in such other state."

In Hargis v. McWilliams, Inc., supra, the plaintiff, a resident of Louisiana, entered into a contract of employment with the defendant, a Louisiana corporation, on August 1, 1925, to perform services in the state of Florida for an indefinite period, and was injured on May 3, 1926. He brought suit to recover compensation under the Louisiana statute. In giving extraterritorial effect to the Compensation Law of this state the court pointed out that there was nothing in the act restricting liability to work performed within the state, and that the contract of employment was entered into in Louisiana. This court said:

"It matters not where the work is to be performed; the question is where was the contract made. If the law of the place where

the contract was made fixes liability, the liability follows the employer wherever the work is done. Any other view would leave the workman without remedy or relief contrary to the object and spirit of the law and against the principle that the compensation law must be interpreted liberally, in a sense favorable to the workman.

"The Employers' Liability Act of Louisiana forms part of every contract made in Louisiana for the employment of labor and carries ·with· it ·the liability of the employer under said act· for every injury suffered by the employee·in the course of his employment in executing the work within or without the state." (Citing numerous authorities).

In both of those cases a writ of certiorari was applied for and refused by the Supreme Court.

In Durrett v. Eicher-Woodland Lumber Co., supra, the Court of Appeal of the Second Circuit, in its .original opinion, found as a fact that the plaintiff, a resident of Louisiana, had entered into a contract of employment with the defendants, which were located and doing business in the state of Louisiana, and awarded the plaintiff compensation for injuries suffered while acting as a sawyer in the state of Mississippi, but on rehearing the court found as a fact that the defendants were not located and doing business in the state of Louisiana at the· time the contract was ·entered into, and that the contract of employment was made in the state of Mississippi. The court therefore reversed its judgment and held that the Louisiana Compensation Law was not applicable. In the opinion rendered on rehearing the court quoted with approval and followed the doctrine announced in Watts v. Long, supra, and (on page 508 of 19 La. App., 136 So. 112, 140 So. 867, 870) used the following language:

"In Watts v. Long, 116 Neb. 656, 218 N. W. 410, 59 A. L. R. 728, the court laid down the following principle of law:

" 'The Employers' Liability Law of this state (Laws 1913, c. 198, as amended) is not applicable to a nonresident employer and resident employee, where the contract of employment was made in this state for services to be performed in another state, and the employer was not, at the time of the contract, engaged in any trade, business, profession, or avocation in this state. ·

" 'Such law is applicable where the employer is engaged in any trade, business, profession, or avocation in this state and the employee, while performing work incident to such business in another state, is there injured'—citing New York C. R. Co. ·v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629, Mountain Timber Co. v. Washington, 243 U. S. 219, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642.

"The latter paragraph above quoted sets forth the application of the extraterritorial power of the Employers' Liability Law. The Hargis Case is an example of its application in this state. The Watts v. Long Case, above referred to and those cited in connection.with it,. not only recognize this extraterritorial power of the Workmen's Compensation Law of the various states which have the law, but it also holds that such a law is not applicable to a nonresident employer and resident employee where the services to be performed are in another .state, and the employer was not, at the time of the contract, engaged in any trade or business in the state of the resident employee, as set out in the ·first paragraph above quoted from the decision. And this, according to the decision, is true, even in cases where the contract of employment is made in the state of the employee's residence."

We do not consider that the last above-cited case conflicts with the Hargis v. McWilliams Case, supra, because in the Hargis Case both contracting parties were residents of Louisiana and the contract was entered into in this state, whereas in the Durrett Case the court finally concluded that the contract was entered into in Mississippi, after defendants had permanently left the state of Louisiana and located in Mississippi.

The case of American Mutual Life Ins. Co. v. McCaffrey, supra, in our opinion is in conflict with the decisions of the courts of appeal of this state. In that case the defendant, a Tennessee corporation, entered into a contract of employment with the plaintiff, a resident of Tennessee, at Chattanooga on April 15, 1928, which required him to go to Texas for the purpose of erecting a tank. The contract provided for his salary and for his transportation to destination and return. He was injured while working in the course of his employment in Texas on May 10, 1928, and sued to recover compensation under the Texas Compensation Law. The defendant was the insurer of the employer against such liability in both Tennessee and Texas, and contended that, because the contract was entered into in the state of Tennessee, the plaintiff's right to recover was solely under the Compensation Law of Tennessee. In awarding the plaintiff compensation under the Texas law the court said: "We shall not indulge in a discussion of nor attempt to differentiate the many cases cited by counsel from state courts, as some of them appear to support one side and some another. We prefer to cling to the well-recognized principle that a contract made in one state, to be wholly performed in another, as to remedies, is governed by the law of the state where the performance is had. And in the absence of clear proof to the contrary, it will be presumed that the parties .intended such agreement to be controlled thereby. 13 C. J. p. 259, verbo 'Contract'·§

32." The Supreme Court of the United States denied the application for a writ of certiorari. See 281 U. S. 751, 50 S. Ct. 354, 74 L. Ed. 1162.

In Bradford Elec. Light Co., Inc., v. Clapper, supra, the electric light company was domiciled in Vermont, where it had its principal place of business, but had electric lines extending into the state of New Hampshire. Leon Clapper, a resident of Vermont, was employed as a lineman for emergency service in either state under a contract of employment entered into in Vermont. He was killed in the course of his employment in New Hampshire, and the administratrix, a resident of New Hampshire, brought suit for damages in the state court of New Hampshire against the employer, which had the case moved to the federal court on account of diversity of citizenship. Each state had a Workmen's Compensation Statute of the elective type, the statute of New Hampshire permitting an employee to elect, after injury, to sue for compensation or damages as at common law, and the Vermont statute confined his claim to one for compensation, being similar to the statute in Louisiana in that respect. The company defended upon the ground that the suit was controlled by the Vermont statute, as the contract of employment was entered into in that state between residents thereof, and invoked the "full faith and credit clause" of the United States Constitution. The administratrix contended that the "full faith and credit clause" was not applicable, as a state's power to legislate is limited to its own territory. There was judgment in favor of the plaintiff in both the district and circuit courts, and the Supreme Court granted a writ of certiorari. On this point the Supreme Court said: "But, obviously, the power of Vermont to effect legal consequences by legislation is not limited strictly to occurrences within its boundaries. It has power through its own tribunals to grant compensation to local employees, locally employed, for injuries received outside its borders, compare Quong Ham Wah Co. v. Industrial Accident Commission, 255 U. S. 445, 65 L. Ed. 723, 41 S. Ct. 373, dismissing writ of error, 184 Cal. 26, 12 A. L. R. 1190, 192 P. 1021; and likewise has power to exclude from its own courts proceedings for any other form of relief for such injuries. The existence of this power is not denied."

The Supreme Court reversed the decision, holding that, as the contract of employment was entered into in Vermont between residents of that state, the law presumed that the parties contracted with reference to the compensation laws of that state, and, therefore, the Vermont Compensation Act applied.

To the same effect see Industrial Commission v. Aetna Life Ins. Co., 64 Colo. 480, 174 P. 589, 3 A. L. R. 1336; Metropolitan Casualty Ins. Co. v. Huhn, 165 Ga. 667, 670, 142 S. E. 121, 59 A. L. R. 719; Beall Bros. Supply Co. v. Industrial Commission, 341 Ill. 193, 173 N. E. 64; Pederzoli's Case, 269 Mass. 550, 169 N. E. 427; Crane v. Leonard, Crossette & Riley, 214 Mich. 218, 183 N. W. 204, 18 A. L. R. 285; Anderson v. Miller Scrap Iron Co., 169 Wis. 106, 170 N. W. 275, 171 N. W. 935.

In the proposed final draft No. 3 of the American Law Institute Restatement of the Law on the subject of Conflict of Laws, § 438, it is provided that "no recovery can be had under the Workmen's Compensation Act of a state if neither the injury occurred nor the contract of employment was made in the state."

In the light of the foregoing authorities we are of the opinion that the Compensation Statute should be given extraterritorial effect in the instant case because the contract was entered into in the state of Louisiana between residents of the state and relief is sought in the courts of this state.

The defendant's next defense is that, as the deceased's employment was changed from that of stenographer to inspector of materials, tools and equipment, at an increased salary, some time after he arrived at Nicaragua, there was a new contract of employment made in Nicaragua, and, consequently, the Workmen's Compensation Law of Louisiana does not apply.

As we view the evidence, the deceased acted under the same contract of employment from the time he was engaged until the time of his death, because the change in his position and the increase of his salary was merely a promotion which also had to be approved by the New Orleans office before it became effective. The original contract as to board and lodging and transportation was still in effect and in no way abrogated or set aside. We find this defense to be without merit.

Did the accident arise out of and in the course of deceased's employment? The evidence shows that deceased was employed as an inspector of materials, equipment, and tools and furnished with a motorcar for the purpose of going to the respective plantations owned and operated by the defendant in order to determine whether or not these physical assets of the company were properly accounted for by those who had immediate custody and charge of them. On the morning that he was shot he left Puerta Cabezas with another employee by the name of Mr. Nutt to go to a place known as Logtown, some sixty miles toward the interior, for the purpose of performing his duties. The car was operated by a native boy. After going about thirty miles they stopped and were informed that bandits had broken into the defendant's commissary at Logtown the night before and stolen the contents thereof. The deceased conferred with a native sergeant of the local

police, and, together with three or four native guards, Mr. Nutt, and the motor operator, they started toward Logtown on the motorcar. As they neared Logtown they were able to see a number of bandits looting the company's commissary. Apparently feeling that they were hopelessly outnumbered, they returned to the point where they were originally informed of the presence of the bandits, and the deceased then telephoned the manager of the defendant company at Puerta Cabezas, who testified that he told the deceased: "You stay right where you are; Captain Pfeferle is coming with reinforcements," and that the deceased said: "All right." Captain Pfeferle, a United States Marine soldier, with several soldiers of the local or native militia, arrived at the point where the deceased was waiting some time later, and, after a hurried conference with the deceased, they all proceeded in the captain's motorcar toward Logtown. As a precautionary measure, when they approached Logtown they stopped the motor car and left the motor running in order to lead the bandits into believing that the car was still moving because of the noise made by the exhaust, and divided into two bands on either side of the company's railroad track for reconnoitering. But it appears that the previous trip of the motorcar apprised the bandits of the fact that they were being watched and they sent out a party which surprised and ambushed the force of Captain Pfeferle, who, with the deceased and one of the soldiers, was killed by the bandits on the defendant's railroad right of way.

The evidence convinces us that the country was wild and the natives semicivilized, and that the towns were preyed upon by bands of bandits, which necessitated the presence of the United States Marines and the native militia in order to protect the property and lives of the law-abiding residents and business interests in that section. We also find that the company furnished arms to some of its employees and countenanced the practice of its employees carrying arms for their own protection and the protection of the company's property, particularly when it was necessary to go to the different plantations in the interior, where the country was thinly populated and there was greater hazard and danger from attack by bandits.

We do not construe the manager's instructions to the deceased as an order not to accompany Captain Pfeferle to Logtown, and, if he meant to give such instructions, his statement to the deceased was misleading and could have been very reasonably and plausibly interpreted to mean that he should wait until the captain came with reinforcements before attempting to return to Logtown. The manager admits in his testimony that he did not consider that the deceased disobeyed him, but felt that he went for adventure.

Mr. Brownson, the general foreign manager of the company, and Mr. Nutt, the company's mechanic, both testified that they considered it the duty of the employee to protect the company's property under normal conditions, but that they did not expect an employee to endanger his life in doing so.

In the case of Myers v. La. Ry. & Nav. Co., 140 La. 937, 74 So. 256, 259, which was one of the first cases arising under the Employer's Liability Law of this state, the Supreme Court said: "This, it seems to us, is putting too narrow a construction upon the statute. It ought to be sufficient that the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment. This is certainly the view that has been taken in street accidents, where relief has been allowed in certain cases and not in others."

In Dyer v. Rapides Lumber Co., 154 La. 1091, 98 So. 677, 679, which is very similar to the instant case, the deceased was employed by the defendant as a watchman in an isolated locality, and, while making a fire at night, he was shot and killed by an unknown party. The Supreme Court stated that Myers v. La. Ry. & Nav. Co. was the leading case on the subject, and, in holding the employer liable, said: "We think that where a workman is exposed to some risk manifestly necessitated by his employment he is entitled to his compensation, unless it be also manifest that he would at the time of the occurrence have been equally exposed to the same risk outside of his employment. And we cannot assume that a man is exposed to the same danger of attack at his own home, or in some frequented place, or in the daytime, as he would be when called by his employment to some lonesome spot and in the nighttime."

In the recent case of Kern v. Southport Mill, Ltd., 174 La. 432, 141 So. 19, 21, the plaintiff was employed by defendant as a pipe-fitter and was instructed to do some outside work, and, upon returning to the defendant's mill, stepped out of a street car into the path of an automobile and was permanently injured. In reversing the decision of the Court of Appeal and awarding compensation to the plaintiff the court said:

"In determining, therefore, whether an accident 'arose out of' the employment, it is necessary to consider only this: (1) Was the employee then engaged about his employer's business and not merely pursuing his own business or pleasure; and (2) did the necessities of that employer's business reasonably require that the employee be at the place of the accident at the time the accident occurred?

"The question whether or not the employee might have been injured in the same way,

and even at the same place and time had he not been called there by the necessities of his employer's business, but had gone there only for his own pleasure or in pursuit of his own business, has nothing whatever to do with the case. It was his employer's business which called him to the place and time of the accident and not his own pleasure or business; and hence his injuries arose out of his pursuit of his employer's business and not out of his pursuit of his own business or pleasure."

See, also, Ferguson v. Cady-MacFarland Gravel Co., 156 La. 871, 101 So. 248; Byas v. Hotel Bentley, 157 La. 1030, 103 So. 303; Brown v. Vacuum Oil Co., 171 La. 707, 132 So. 117; Ward v. Standard Lumber Co., 4 La. App. 89; Parker v. Leton Gin Co., 5 La. App. 727; Schexneider v. General American Tank Car Corporation, 5 La. App. 84; Le Blanc v. Ohio Oil Co., 7 La. App. 721; Thiemann v. National Refrigerator & Fixture Co., 10 La. App. 98, 120 So. 512; Catherin v. Commercial Casualty Ins. Co., 18 La. App. 690, 138 So. 455.

The duties of the deceased, as inspector of materials, tools, and equipment, required him to go to Logtown for the purpose of seeing that all of the company's property was properly accounted for. As the company's property had been stolen by the bandits, there was every reason why the deceased should go there for the purpose of determining the extent of the company's loss in order to report it to his superior. Mr. Nutt, the company's witness, stated that they believed that the bandits would disperse and flee upon their approach and had no idea that they would be attacked. While it is true the deceased was not employed as a guard to protect the company's property from bandits, the evidence convinces us that it was contemplated that he should take reasonable and precautionary measures to prevent the theft of the company's property. The evidence fails to convince us that the deceased went with Captain Pfeferle's party for adventure and to gratify his personal curiosity.

We conclude that deceased was killed while acting within the course and scope of his employment.

The defendant also complains of the manner in which our learned brother below computed the compensation and prorated or divided it among the dependents. The judge of the district court decreed that the defendant should pay compensation to Mrs. Selser, the widow, individually, at the rate of $10 per week, and as the mother for the use and benefit of her own minor child, Bruce O. Lilleton, at the rate of $3.33 per week; to I. M. Selser, guardian, for the use and benefit of Will L. Selser and Elizabeth Selser, minor children of the deceased, at the rate of $3.33 each per week. He further decreed that from May 28, 1934, when Will L. Selser becomes

eighteen years of age, there should be paid to Mrs. Selser, for the use and benefit of her minor child, the sum of $5 per week, and to I. M. Selser, for the use and benefit of Elizabeth Selser, the sum of $5 per week; and from February 15, 1935, when Mrs. Selser's minor son becomes eighteen years of age, there should be paid to Mrs. Selser the sum of $14.05 per week, and to I. M. Selser, for the use and benefit of Elizabeth Selser, the sum of $5.95 per week; and then, from July 24, 1935, when said Elizabeth Selser becomes eighteen years of age, there should be paid to Mrs. Selser compensation at the rate of $16.67 per week, for the remainder of the 300-week period.

The defendant contends that there are two groups of dependents before the court, the widow and her own child, and the two children of the deceased by the prior marriage represented by their guardian; that each group is entitled to 46¼ per cent. of the wages of the deceased, subject to the maximum amount of $20; that the widow and her child are entitled to one-half of the maximum compensation of $20, or $10, and the two children of deceased are entitled to the remaining $10; that the statute does not look to the future, but fixes the dependency and amount to be paid the dependents as of the date of the death of deceased; that, as the minors become eighteen years of age, payment of their respective amounts of compensation shall cease; that there is no provision in the statute for adding, at the time that one of the minors becomes eighteen years of age, the compensation which ceases as to that minor, to the amount due any other dependent either proportionately or otherwise. In short, the defendant's contention is that, as each of the minor dependents ceases to be a dependent under the provisions of the statute upon reaching eighteen years, the amount of compensation payable to such persons ceases without any right on the part of the remaining dependents to claim their proportionate share thereof and add it to the original amount which was awarded to them as of the date of the death of the deceased.

Paragraph E of subsection 2 of section 8, p. 359, of Act No. 242 of 1928, reads as follows:

"Payment to such dependents shall be computed and divided among them on the following basis.

"1. If the widow or widower alone, thirty-two and one-half per centum of wages.

"2. If widow or widower and one child, forty-six and one-quarter per centum of wages.

"3. If widow or widower and two or more children, sixty-five per centum of wages.

"4. If one child alone, thirty-two and one-half per centum of wages of deceased.

"5. If two children, forty-six and one-quarter per centum of wages.

"6. If three or more children, sixty-five per centum of wages."

■ As the deceased left a widow, one stepchild, and two of his own children, who were also dependents, there is no doubt that the case falls under the provision of the statute which fixes the compensation at 65 per cent. of the wages of the deceased. It is also plain that 65 per cent. of deceased's salary of $225 per month exceeds the maximum amount of compensation of $20 as provided in the statute. Therefore, at the time of the death of the deceased, his dependents were entitled to divide among them the sum of $20 per week. The above-quoted provision of the act divides the compensation among the dependents on the basis or percentage set forth therein. The widow's share being 32½ per cent., or one-half of 65 per cent., she is entitled to one-half of $20, or $10 per week. The remaining $10, in the absence of a provision in the act to the contrary, should be equally divided among the minor dependent children. Consequently each is entitled to one-third of $10, or $3.33.

Subsection 2 of section 8, p. 358, of Act 242 of 1928, provides that in case of death weekly compensation shall be paid for a period of 300 weeks to the legal dependents of the deceased. We have already shown that the widow and the three minor children were the legal and actual dependents of the deceased, but a further limitation upon the period of 300 weeks, during which compensation runs in their favor, is provided in paragraph F of subsection 2 of section 8, p. 360, of Act No. 242 of 1928, as follows:

"The marriage or death of a dependent shall terminate payments to such dependent, but shall not affect payments allowed other dependents. Should the widower become capable of self-support, compensation shall cease as to him. Compensation payments to dependents shall also terminate when the condition of dependency ceases, except in the case of a widow or child.

"When any minor dependent who is not mentally or physically incapable of wage earning, shall become eighteen years of age, payment of the proportion of compensation due such minor shall cease."

■ Whether or not one or more dependents might marry or die during the period for which compensation was due them, and thereby cause compensation to cease as far as they are concerned, is a matter which may or may not happen during that period of time. That is a future contingency with which we need not concern ourselves at this time. Our learned brother below has fixed in the decree the date when the compensation will cease to be due the minors according to their respective eighteenth birthdays, and prorated that amount proportionately among the remaining dependents. We believe he went fur-

ther than the facts of the case required. All of the minor dependents, being under the age of eighteen years and unmarried, are entitled to compensation in the ratio, proportion, and sum as we have above outlined. At the present we are not called upon to say what shall become of the share of the compensation of any one of them at the time it shall legally cease to be due. It is our opinion, therefore, that the decree should be modified and amended so as to eliminate therefrom the provisions for prorating the share of the minor dependents at the time they reach the age of eighteen years.

■ Finally, the defendant claims a credit for $990.50 against any compensation that may be awarded the plaintiffs herein. This amount includes $675 cash voluntarily paid to Mrs. Selser in six checks of $112.50 each, freight and drayage bill amounting to $19.50 for removing her household furniture from the wharf, apparently on her return from Nicaragua, to her home, and $396 for funeral expenses in interring the remains of the deceased, subject to a credit of $100 provided in the compensation statute.

There is no dispute as to the credit of $675, but defendant says that the trial court erred in refusing to allow a credit for the other items claimed.

Subsection 6 of section 8, p. 361, of Act No. 242 of 1928, reads as follows: "Any voluntary payments made by the employer or his insurer either in money or otherwise, to the injured employee, or his dependents, and which are accepted by the employee, which, by the terms of this act, were not due and payable when made, may, subject to the approval of the court, be deducted from the payment to be paid as compensation; provided, that in case of disability, such deductions shall be made by shortening the period during which compensation shall be paid, and not by reducing the amount of the periodical payments."

It will be noted that the "voluntary payments made by the employer or his insurer either in money or otherwise, to the injured employee, or his dependents," must be accepted by the employee and be approved by the court before being deducted from the compensation due. In the instant case the defendant has not shown that the disputed items were paid with the approval and consent, directly or indirectly, of the widow or the guardian. In fact the defendant admits that these items were paid as a matter of charity and generosity on its part.

In the case of Delaney v. Brenner Lumber Co., 154 La. 156, 97 So. 349, the Supreme Court, in interpreting a similar provision contained in paragraph 5 of section 8, p. 473, of Act No. 247 of 1920, held that expenses for medical and surgical services in excess of the amount provided in the act should not be

credited against the compensation allowed, unless the payment was made with the express consent of the injured employee. The court said:

"The Court of Appeal, in its opinion, held that even if the section of the law relied on does not authorize the deduction, there is nothing in the statute to forbid it, and, influenced by the equitable considerations of the case, rendered its judgment allowing defendant credit for the excess medical and surgical expenses paid. * * *

"The remedy in such cases is for the employer, or his insurer, to obtain the express consent of the employee before incurring excessive charges·in his behalf.

"If the employer, or his insurer, could be permitted to impose upon the employee, without his consent, extraordinary or heavy medical, surgical, and hospital expenses, which might or might not be beneficial to him, it might well happen that such expenses and charges would consume a large part, if not all, of the compensation to which the employee is entitled."

The same line of reasoning is applicable here. Under the circumstances of the case we do not believe that the trial court erred in rejecting the funeral and drayage charges.

For the reasons assigned it is ordered, adjudged, and decreed that the judgment of the district court be amended so as to read as follows:

"It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Mrs. William L. Selser, individually, as widow of her deceased husband, and against the defendant, Bragmans Bluff Lumber Company, Inc., in the full sum of $10.00 per week for a period of 300 weeks, beginning April 14, 1931, with legal interest on each installment from its due date until paid, subject to a credit of $675.00, which is to be deducted by shortening the period during which compensation shall be paid to her and not by reducing the amount of the periodical payments.

"It is further ordered, adjudged and decreed that there be judgment herein in favor of Mrs. William L. Selser, mother, for the use and benefit of her minor child, Bruce Oceanus Lilleton, and against the defendant, Bragmans Bluff Lumber Company, Inc., in the full sum of $3.33 per week for a period of 300 weeks, beginning April 14, 1931, with legal interest on each installment from its due date until paid.

"It is further ordered, adjudged and decreed that there be judgment herein in favor of I. M. Selser, as duly appointed and qualified guardian of the minors, William L. Selser and Elizabeth Selser, and against the defendant, Bragmans Bluff Lumber Company, Inc., in the full sum of $6.67 per week, in the proportion of $3.33 and $3.34 respectively, for a period of 300 weeks, beginning April 14, 1931, with legal interest on each installment from its due date until paid."

In all other respects the judgment appealed from is affirmed, defendant to pay the costs of appeal.

Affirmed.

WESTERFIELD, Judge (concurring).

I agree with all that is said by the majority opinion concerning the liability of defendant, but am of opinion that compensation should be paid "entirely to the widow," as provided in paragraphs G and H of subsection 2 of section 8, p. 360, of Act No. 242 of 1928.